862 A.2d 1094

**Carl A. ABRAMS**

v.

**AMERICAN TENNIS COURTS, INC.**

**No. 2517, Sept.Term, 2003.**

Court of Special Appeals of Maryland.

Dec. 9, 2004.

214

---

Steven J. Scheinin, Towson, for appellant.

Roger O. Robertson, Baltimore, for appellee.

Panel: SALMON, EYLER, DEBORAH S., SHARER, JJ.

SALMON, J.

Carl Abrams filed a complaint in the Circuit Court for Baltimore County against his former employer, American Tennis Courts, Inc. ("ATC"). ATC filed a motion for summary judgment, which was granted on the basis that Abrams was barred by the doctrine of judicial estoppel from filing the complaint. Summary judgment was entered in favor of ATC.

The sole question presented in this appeal is whether the trial court erred when it granted summary judgment on the ground that Abrams was judicially estopped from pursuing his claim.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

Carl Abrams ("Abrams") brought a workers' compensation claim against ATC and its insurer, the Injured Workers' Compensation Fund. In that claim, Abrams alleged that, while on ATC's premises, he fell and was severely injured. According to what was said in his claim form, Abrams was "walking down a short flight of stairs when [he] slipped and fell on [his] back." The time of injury was reported to be 5 a.m. on August 2, 1995. Initially, ATC and its insurer accepted as true Abrams's statement as to how, when, and where the accident occurred.

Based on facts set forth in appellant's claim form, the workers' compensation commission, ("the Commission"), on October 13, 1995, ordered ATC and its insurer to: (1) pay Abrams $200 per week and (2) pay all medical bills that arose out of the August 2, 1995, accident. Pursuant to the aforementioned Commission's order, and based on a belief that the accident had occurred in the manner reported by appellant, ATC's insurer thereafter paid to appellant over $185,000 for medical bills and lost wages.

After paying these compensation benefits for a little over one year, the employer/insurer received information that cast doubt upon Abrams's veracity. The employer/insurer, armed with new information, alleged fraud and asked the Commission to reconsider its October 13, 1995, order. A hearing

concerning these allegations was held on May 5, 1997, before Commissioner Charles Krysiak.

The employer/insurer called Abrams as an adverse witness at the reconsideration hearing. Abrams testified that his girlfriend drove him to ATC's warehouse on the morning of the accident. He further testified that he "punched the time clock" at 5 a.m., and as he was leaving the warehouse and descending some stairs, he slipped on some beads and fell down the stairway.

The following exchange occurred between Abrams and counsel for the employer/insurer:

Q So it's your testimony, sir, that the accident happened at work; correct?

A Yes, sir.

Q No doubt in your mind about this?

A No.

\* \* \*

Q ... About two months after you were released from the hospital, you had a conversation with David Hands and some other people in your home about your being injured. Do you remember that? Do you remember them coming to make sure you were doing okay?

A I remember them coming.

Q During the course of that conversation, you told them that you were run over by a truck operated by Norm [Alley, Jr.] at your house?

A No, I did not say that.

\* \* \*

Q You're denying that?

A Yes, I am. I've never said anything like that. That would be ridiculous to say something—

Norman Alley, Jr. ("Alley"), who was Abrams's foreman on the date of the injury, testified at the hearing that he was present at the warehouse when Abrams arrived about 5 a.m.,

and he also happened to be standing near the stairway when Abrams fell down the steps. Alley further testified that he, along with Michael Rutledge, a co-employee, put Abrams in a company pickup and drove him to the hospital. Alley recalled that when he returned to the warehouse he saw some beads on the steps where Abrams had fallen.

David Hands ("Hands"), who did not witness Abrams's accident, testified that a few weeks after Abrams got out of the hospital, he, Michael Rutledge, and a Patrick O'Toole visited Abrams at the latter's home—where Abrams was recuperating from his injuries. Hands related that Abrams told him "that Norman [Alley, Jr.,] . . . and Mike [Rutledge] came to pick him up and [Abrams and Alley] were arguing."

Hands's testimony continued:

Q [COUNSEL FOR APPELLEE]: Did he say where that was?

A He didn't tell me exactly where it was.

He [Abrams] said that they were arguing. He went to get out of the truck, and the truck clipped him.

Q Did he say anything about slipping on the steps at work?

A No.

Q Did he say why he was claiming that the incident happened at work?

A For more money. He wanted more money.

Michael Rutledge ("Rutledge") testified at the reconsideration hearing that in August of 1995 he worked for ATC. He was assigned to a work crew, which was composed of himself, Norman Alley, Jr., and Abrams. According to Rutledge, on the date of the accident, the three-man crew was scheduled to go to Virginia to work on a project. The crew members were to meet at ATC's warehouse at 5 a.m., but Abrams did not arrive on time. While Rutledge and Alley waited, Alley "punched" Abrams's time card. The witness and Alley waited for five to ten minutes and then drove, in the company truck, to Abrams's grandmother's house where they found Abrams standing "in the middle of the road." Abrams got into the company pickup "reek[ing] of alcohol." An argument between

Abrams and Alley immediately commenced and lasted for about three minutes, whereupon Abrams said he was going to "quit the crew." Abrams got out of the truck. After alighting, he reached back into the vehicle to get his jacket, but as he did so, Alley "hit the gas," and the truck went forward. Abrams was then struck by the pickup. Alley stopped the vehicle immediately, and Rutledge and Alley put Abrams into the vehicle and transported him to a nearby hospital. While in route to the hospital, the threesome (Alley, Abrams, and Rutledge) concocted a story that Abrams had suffered injuries when he fell down some steps at ATC's warehouse.

In an apparent effort to give Abrams's story a *patina of verisimilitude,* Rutledge went back to the warehouse about 5:45 a.m. and sprinkled some beads on the steps in the area where, according to the agreed-upon story, Abrams had fallen.

Sixteen months after the accident—according to Rutledge— he confessed to one of the officers of ATC that Abrams's original story as to how the accident occurred was false.

Commissioner Krysiak, based on the testimony he had heard at the May 5, 1997, hearing, ruled as follows:

> [T]he claimant did not sustain an accidental injury arising out of and in the course of employment as alleged to have occurred on August 2, 1995; and [the Commission] will rescind and annul the Award of Compensation dated October 13, 1995; and finds that the disability of the claimant is not the result of the alleged accidental injury, and the Commission will disallow the claim filed herein. The Commission finds that employer and insurer are entitled to reimbursement pursuant to Section 9–310.1 of the Labor and Employment Article.

Abrams filed a timely petition for judicial review in the Circuit Court for Baltimore County, in which he sought to overturn Commissioner Krysiak's decision.

In September 1997, while the "appeal"[1] from Commissioner Krysiak's adverse decision was pending, Abrams filed a second

---

1. We use the term "appeal" as legal shorthand. Technically, a petition for judicial review filed pursuant to Maryland Rule 7–200 et seq. is not

workers' compensation claim concerning the injuries he received on August 2, 1995. Abrams described the accident in the second claim form as follows: "When my foreman came to pick me up for work, the company truck he was driving struck me."

The second workers' compensation claim was considered by Commissioner Lauren Sfekas at a hearing on January 6, 1998. The employer/insurer raised issues of accidental injury, causal relationship, limitations, and notice. At the hearing, Abrams's attorney acknowledged that his client "was actually struck by the truck" owned by ATC and driven by Alley—and had not fallen down stairs on ATC's premises.

Commissioner Sfekas refused to re-litigate the second workers' compensation claim, stating:

> It's a duplicate claim, different facts. It's the same injury, same T.T., same parts. It's the same incident. The way it happened is alleged to be different, but it's the same claim and it's part of that other claim and that case is upon on [sic] appeal. . . . I am not going to re-litigate the merits because Commissioner Krysiak has found this claim not compensable and it's the same claim.

Abrams filed a petition for judicial review of Commissioner Sfekas's decision. The Circuit Court for Baltimore County consolidated the two workers' compensation cases, and they were tried, non-jury, before the Honorable Robert E. Cadigan.

In the circuit court proceeding, Abrams testified that on "three or four" occasions prior to the accident, his employer had made special arrangements to transport him to and from work. According to Abrams, August 2, 1995, was one of those special occasions.

---

an appeal. *See Kim v. Comptroller of the Treasury,* 350 Md. 527, 714 A.2d 176 (1998); *see also Board of License Comm'rs for Anne Arundel County v. Corridor Wine, Inc.,* 361 Md. 403, 414–15, 761 A.2d 916 (2000) ("[C]ircuit courts exercise neither appellate nor oversight authority with regard to administrative agencies. Even though some statutes and cases improperly use the word "appeal" to refer to actions for judicial review of adjudicatory administrative decisions, they are not appeals. Such actions are original actions in the circuit courts.").

Abrams related that, on the evening before the accident, one of Alley's superiors gave Alley permission to pick him up in the company truck at his grandmother's residence, where he was staying. Abrams testified that when he was picked up by Alley on the morning of the accident the two immediately got into an argument. During the argument, Alley, his foreman, struck him in the face with his fist. Abrams then "hopped out of the truck." At that point, although he still had the intention of going to work, it was his plan to walk to ATC's warehouse and ask Dennis Ross, one of ATC's officers, if he could start his own crew—because he had previously been a foreman. But, according to Abrams, as he stood by the truck, and while the passenger side door was still open, Alley took off in the truck whereupon he was struck by a rectangular box, which was attached to the side of the pickup.

Massey Rossi ("Rossi"), ATC's vice-president, testified that Abrams was employed by ATC as a laborer on the date of the accident. In Mr. Rossi's words, "We don't provide transportation for the laborers." The witness then contradicted Abrams's claim that Alley had been given "special permission" to pick up Abrams on the morning of the accident.

Rossi conceded that, on certain occasions, Alley had permission to use the truck to get to and from work. He explained that a foreman, such as Alley, was in a different position from a laborer insofar as transportation was concerned.

After hearing the evidence of Rossi and Abrams, Judge Cadigan said that he was unconvinced that Alley had special permission to pick up Abrams at his residence on the morning of the accident. Therefore, Judge Cadigan found that the accident occurred when appellant was going to work and did not arise out of or in the course of Abrams's employment with ATC. Accordingly, Judge Cadigan affirmed the decisions of Commissioners Krysiak and Sfekas. No appeal was taken from Judge Cadigan's decision.

After his workers' compensation suits failed, Abrams filed a tort suit against ATC, Alley, and Rutledge[2] in the Circuit Court for Baltimore County. It is that suit that is before us for resolution.

The complaint sets forth a third version of the circumstances surrounding Abrams's injury. The third version is similar, but far from identical, to the second version presented to the Commission. In his complaint, appellant asserts that ATC is liable to him vicariously for the negligence of one of its employees and that he received his injuries in the following manner.

> On August 2, 1995, at approximately 5:25 a.m., the [p]laintiff, CARL A. ABRAMS, was carefully and prudently walking on a public street in the 8100 block of Shore Road in Baltimore County, Maryland, away from the vehicle driven by the [d]efendant, NORMAN W. ALLEY, JR., acting as agent for AMERICAN TENNIS COURTS, INC., when suddenly and without warning, the [d]efendant accelerated the motor vehicle, striking the [p]laintiff and knocking him to the ground. . . .

ATC filed an answer to Abrams's complaint and then filed a motion for summary judgment, in which it maintained that Abrams's tort claim was barred by the doctrine of election of remedies and by the doctrine of *res judicata*. The motions court granted summary judgment in favor of ATC on the ground that Abrams's claim was barred by the doctrine of election of remedies.

A panel on this Court reversed the grant of summary judgment. In the conclusion section of the panel's decision, the panel said:

> Because none of the reasons advanced by ATC for the affirmance of the grant of summary judgment are meritorious, we reverse the judgment of the trial court.

---

**2.** The claims against Alley and Rutledge have been settled with a stipulation that the settlement would not affect the present case in any fashion.

One issue, not argued by appellee, is whether the doctrine of judicial estoppel would prevent Abrams from successfully suing it. The doctrine of judicial estoppel was thoroughly explained in *WinMark, L.P. v. Miles & Stockbridge,* 345 Md. 614, 620–21, 693 A.2d 824 (1997). More recently, judicial estoppel was discussed by this Court in *Gordon v. Posner,* [142 Md.App. 399, 790 A.2d 675 (2002) ]. We said in *Gordon:*

[J]udicial estoppel "precludes a party who ... secured a judgment in his or her favor from assuming a contrary position in another action simply because his or her interests have changed." *Mathews v. Gary,* 133 Md.App. 570, 758 A.2d 1019 (2000), *aff'd on other grounds,* 366 Md. 660, 785 A.2d 708 (2001) (quotation marks and citation omitted).

*Id.* at [424–25], 790 A.2d 675.

Abrams v. American Tennis Courts, Inc., No. 487 (Md. Ct. Spec. App., unreported, filed April 1, 2002), at 20.

The case was remanded to the Circuit Court for Baltimore County, whereupon ATC again moved for summary judgment, this time on the ground of judicial estoppel. The motion for summary judgment was supported by several relevant excerpts of testimony from proceedings before Judge Cadigan and the Commission. The motion was also supported by an affidavit from Michael J. Klein, ATC's insurance broker. That affidavit read as follows:

[ ] That American Tennis Courts, Inc. (ATC) placed its workers' compensation insurance coverage with the Injured Workers' Insurance Fund (IWIF) prior to Mr. Carl Abrams [sic] accident of August 2, 1995. ATC paid the assessed premium to IWIF to secure that coverage.

[ ] That a large reserve for the August 2, 1995[,] loss was established by IWIF upon notification of Mr. Abrams' slip and fall claim. IWIF ultimately paid in excess of One Hundred Eighty–Five Thousand Dollars ($185,000.00) on behalf of ATC for Mr. Abrams' medical and wage benefits.

[ ] That the Abrams slip and fall claim had a significant impact on ATC's workers' compensation coverage, resulting in higher premiums to ATC for a number of years.

First, beginning in the policy term 3/1/97–98, the experience modification calculations for three years was negatively impacted by the claim. Secondly, very few carriers would entertain an account with such significant adverse experience. And third, those carriers that would entertain the risk, would not offer their most attractive products.

[ ] That the Abrams slip and fall claim increased the costs to ATC by Twenty–Five Thousand Dollars to Fifty Thousand Dollars ($25,000.00 to $50,000.00) in the years following the claim. The documentation of the precise amount of the increased expense is no longer available, but I am certain that the stated estimate is a fair and reasonable assessment of the actual increased premium costs to ATC.

Abrams filed an opposition to the summary judgment motion, unsupported by affidavit or any other sworn material. Abrams asserted that the judicial estoppel doctrine was inapplicable for three reasons: (1) that he was not successful in his claims filed with the Commission; (2) that ATC was not harmed because ATC's insurance carrier, not ATC, paid the attorneys' fees and workers' compensation awards; and (3) that the affidavit of Michael J. Klein was insufficient to show that ATC had been harmed by his (Abrams's) filings before the Commission. Despite the allegation of no harm, counsel for appellant admitted that his client had not paid back the $185,000 to ATC or its insurer because he (Abrams) was impecunious.

## II. *ANALYSIS*

 In this appeal, appellant makes one argument, *viz*, that the doctrine of judicial estoppel is inapplicable because appellee failed to prove that appellant prevailed before the Commission.[3]

---

3. Appellant does not contend in this appeal that the motion judge erred when he rejected appellant's claim that ATC was not prejudiced by his initial false claim.

### A.

Recently, in *Chaney Enterprises Limited Partnership v. Windsor*, 158 Md.App. 1, 854 A.2d 233 (2004), we said:

Although we have not found a Maryland case that is pertinent, numerous jurisdictions have recognized that the doctrine of judicial estoppel applies to administrative proceedings. *See, e.g., King v. Herbert J. Thomas Memorial Hosp.*, 159 F.3d 192, 196 (4th Cir.1998) (stating that the doctrine of judicial estoppel has three elements, including: "The party to be estopped must be asserting a position that is factually incompatible with a position taken in a prior judicial *or administrative proceeding* ....") (emphasis added); *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2nd Cir.1997) ("Numerous decisions have approved the application of judicial estoppel where the prior statements were made in administrative or quasi-judicial proceedings."); *Portela–Gonzalez v. Sec'y of the Navy*, 109 F.3d 74, 78 (1st Cir.1997) ("[A] party cannot take one position in an underlying administrative proceeding and then disclaim it in a subsequent suit arising out of the agency proceedings."); *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir.1993) ("[T]he doctrine [of judicial estoppel] has been applied, rightly in our view, to proceedings in which a party to an administrative proceeding obtains a favorable order that he seeks to repudiate in a subsequent judicial proceeding."); *Alabama v. Shalala*, 124 F.Supp.2d 1250, 1266 (M.D.Ala. 2000) ("The doctrine of judicial estoppel applies even where the party made the prior inconsistent statements in an administrative forum."); *Kamont v. West*, 258 F.Supp.2d 495, 499 (S.D.Miss.2003) (concluding that plaintiff was judicially estopped from pursuing her claims with the Equal Employment Opportunity Commission because she failed to disclose such claims in a prior bankruptcy petition requiring her to reveal all known causes of action.); *Barack Ferrazzano Kirschbaum Perlman & Nagelberg v. Loffredi*, 342 Ill. App.3d 453, 277 Ill.Dec. 111, 795 N.E.2d 779, 786–88 (2003) (concluding that, in state court proceeding, clients were judicially estopped from challenging reasonableness of claim

of former attorneys for legal fees due and owing in connection with representation before the National Association of Securities Dealers, Inc., when clients previously asked NASD to award legal fees against the defendant in the NASD proceeding, and made no claim that the legal fees of the original lawyers were unnecessary or unreasonable); *In re Pich,* 253 B.R. 562, 569 (Bankr.D.Idaho 2000) ("Debtor [in bankruptcy] is not entitled to now stand on residency in order to claim a homestead [exception] having previously, by his application for rezoning, inherently and necessarily represented [to zoning board in classification proceeding] that no residence was contemplated.").

*Id.* at 39 n. 7, 854 A.2d 233.

At oral argument, appellant's counsel admitted that judicial estoppel applies to proceedings before the Workers' Compensation Commission.

■ The doctrine of judicial estoppel "focuses on the connection between litigants and the judicial system." *Gordon v. Posner,* 142 Md.App. 399, 425, 790 A.2d 675 (2002). The doctrine of judicial estoppel provides that "[a] party will not be permitted to occupy inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts and another will be prejudiced by his action." *Id.* at 426, 790 A.2d 675 (internal quotes omitted) (quoting *Stone v. Stone,* 230 Md. 248, 253, 186 A.2d 590 (1962)).

■ In *Middlebrook Tech, LLC v. Moore,* 157 Md.App. 40, 849 A.2d 63 (2004), we said:

Three factors "typically inform the decision whether to apply" the doctrine of judicial estoppel in a particular case: whether the party's later position is clearly inconsistent with its earlier position; whether the party succeeded in persuading the court in the earlier matter to accept its position, so that judicial acceptance of the contrary position in the later matter would create the perception that one of the courts had been misled; and whether the party seeking to

assert the inconsistent position in the later matter would derive an unfair advantage, or would impose an unfair detriment on the other party, from being permitted to do so. *Id.* at 63, 849 A.2d 63.

The factors mentioned are not, however, "inflexible prerequisites" and "[a]dditional considerations may inform the doctrine's application in specific factual contexts." *Vogel v. Touhey,* 151 Md.App. 682, 708, 709, 828 A.2d 268 (2003) (citing *New Hampshire v. Maine,* 532 U.S. at 742, 751, 121 S.Ct. 1808 (2001)).

It is undisputed that appellant adopted a position before the Commission that is inconsistent with that now set forth in his complaint. Appellant contends, however, that the doctrine of judicial estoppel is here inapplicable because he did not succeed in any proceeding before the Commission. According to appellant, he was unsuccessful because, when his fraud was discovered, the Commission rescinded its prior award. In support of that proposition, appellant stresses that the Commission's original order requiring payment was made without a hearing.

As mentioned earlier, appellant, in his first claim form submitted to the Commission, said: "I was walking down a short flight of stairs when I slipped and fell on my back." He signed his name immediately above the following statement:

> I hereby make claim for compensation for an injury resulting in my disability, due to an accident (or disease) arising out of and in the course of my employment and in support of it make the foregoing statement of facts. I hereby certify that the information I have given is accurate and that I have read the information on this form.

It is undisputed that prior to signing its order dated October 13, 1995, the Commission relied on appellant's statements set forth in the claim form. Therefore, appellant's fraud led to the signing of the October 13, 1995, order, which constituted a "success" in every sense of the word. As a result of his fraud, the Commission ordered ATC's insurer to pay appellant in excess of $185,000. Appellant's success was in no sense

undermined by the Commission's later order, which commanded him to pay the money back in view of the appellant's admission that he has not, and cannot, repay the money he fraudulently received.

Whether or not there was a hearing prior to the Commission's initial order is irrelevant because it is undisputed that the Commission signed the order of October 13, 1995, in reliance upon appellant's false statements in the claim form. Thus, appellant succeeded in persuading an administrative agency to accept a position inconsistent with his present position. That success resulted in an administrative determination at odds with appellant's present position. And, if we were to allow the tort suit to go forward while at the same time allowing the appellant to keep the benefits that came about due to the fraud that induced the signing of the October 13, 1995, order, a grave threat to judicial integrity would be presented. All elements needed to invoke the judicial estoppel were proven.

For the foregoing reasons, we hold that the trial judge did not err in granting summary judgment in favor of appellee on the ground of judicial estoppel.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**